UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------- X
THOMAS GIOELI,


                            Plaintiff,                  **FINDINGS OF FACT AND**
                                                        **CONCLUSIONS OF LAW**

        -against-
                                                        14-CV-6806(KAM)(ST)



UNITED STATES OF AMERICA,

                            Defendant.

--------------------------------------- X

**KIYO A. MATSUMOTO, United States District Judge:**

            Plaintiff Thomas Gioeli ("plaintiff") commenced this

action against the United States of America ("defendant"),

pursuant to the Federal Tort Claims Act ("FTCA") 28 U.S.C §§

2671, *et seq.*, seeking damages for injuries he claims to have

suffered on August 29, 2013, when he slipped and fell in unit K-

82 at the Metropolitan Detention Center ("MDC") in Brooklyn, New

York.  The liability portion of the claim was tried before this

court on June 4 and June 5, 2018.  (*See generally* Trial

Transcript ("Tr."), ECF Nos. 49-1 (June 4, 2018 Transcript) and

49-2 (June 5, 2018 Transcript).)[1]

---

[1]     At a status conference held on May 1, 2017, the parties agreed to
bifurcate the trial in this action.  Thus, a trial on damages will be held
only if the court concludes that defendant is liable to plaintiff.  (*See* May
1, 2017 Minute Entry.)

Having considered the evidence presented at trial, assessed the credibility of the witnesses, and reviewed the post-trial submissions of the parties,[2] the court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure ("Rule") 52.[3] For the reasons set forth below, the court concludes that the United States is liable to plaintiff, that plaintiff was also negligent, and that the appropriate apportionment of liability is 50% to each party.

## FINDINGS OF FACT

At trial, the court heard testimony from plaintiff, Sharif Stewart, Manuel Jose Garcia, John Maffeo, Eleazar Garcia, and Kevin Page. Additionally, excerpts from the deposition of Otis Jones were read into the record. Based on the evidence at trial, the court makes the following findings of fact:

## I. Background

### A. The Relevant Individuals

1. Plaintiff was approximately 60 years old at the time of the August 29, 2013 accident that is the subject of this lawsuit (the "Accident"). (Tr. 34:25-35:18.)[4] At that time, he

---

[2] The post-trial submissions of the parties consisted of: Defendant's Proposed Findings of Fact and Conclusions of Law ("Def. Mem., ECF No. 50); Plaintiff's Proposed Findings of Fact and Conclusions of Law (ECF No. 49); and Defendant's Reply to Plaintiff's Proposed Findings of Fact and Conclusions of Law (ECF No. 51).

[3] Rule 52 provides, in relevant part, that following a bench trial, "the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1).

[4] Plaintiff testified that he was 65 years old on June 4, 2018, approximately five years after the Accident.

was in custody at MDC following his June 2008 conviction under
18 U.S.C. § 1962(c), and was lodged in the K-82 unit. (Joint
Pretrial Order (Liability) ("JPTO," ECF No. 47) ¶ 6; *see also*
Tr. 268:1-6.) Plaintiff had been lodged at MDC, a federal
facility, for approximately six years (Tr. 35:10-13), and
plaintiff resided in the K-82 unit for approximately four to
five years during his time at MDC, although it is not clear how
long plaintiff had resided in K-82 prior to the Accident. (Tr.
35:14-18.)

     2.   Sharif Stewart was an inmate lodged in MDC's K-82
unit at the time of the August 29, 2013 Accident. (Tr. 89:20-
90:14.) Mr. Stewart had been lodged in K-82 for approximately
two years at the time of the Accident. (*Id.*) Additionally, Mr.
Stewart worked as an orderly at MDC and, at the time of the
Accident, was the "head orderly." (Tr. 91:25-92:23.)[5] As the
head orderly, Mr. Stewart's duties included serving as a "go
between" for staff and inmates, as well as sweeping and mopping
the unit's open common area. (*Id.*)

     3.   Manuel Jose Garcia was a correctional officer at
MDC at the time of the Accident. (Tr. 130:13-21.)

---

[5] Defendant notes that "head orderly" is not an official title. (Def.
Mem. ¶ 170.) Nevertheless, Mr. Stewart was known unofficially as the "head
orderly" in the K-82 unit at the time of the Accident. (*Id.* ¶ 100; Tr.
154:21-155:1.)

4. John Maffeo is a Bureau of Prisons employee.
(Tr. 188:18-19.) He joined the Bureau of Prisons in 2006 as an
electrical supervisor and is now a general foreman responsible
for "oversee[ing] repairs, maintenance," and maintenance-related
operations, including "[e]lectrical, plumbing, [heating,
ventilation, and air conditioning], and powerhouse operations."
(Tr. 189:4-13.)[6]

5. Eleazar Garcia is an Associate Warden of MDC,[7] and
has been assigned to the facility since December of 2016. (Tr.
217:13-14, 221:13-16.) Warden Garcia has worked for the Bureau
of Prisons since 1995, but never worked at MDC prior to December
2016. (*See* Tr. 217:18-221:14 (detailing Warden Garcia's work
history).) As Associate Warden, he "oversee[s] correctional
service, food service, and health services." (Tr. 221:17-19.)

6. Harvey Taylor was an MDC employee from 1995
through his retirement in 2015, and worked as a case manager
from 2003 until his retirement. (Tr. 244:3-22.)

7. Kevin Page was an MDC employee from 1993 through
his retirement in 2017. (Tr. 269:1-10.) During his time at
MDC, Mr. Page worked as a management analyst, case manager, and

---

[6]    The record is not clear as to the specific position that Mr. Maffeo held at the time of the Accident.
[7]    To avoid confusion, the court refers to Manuel Jose Garcia as "Officer Garcia," and to Eleazar Garcia as "Warden Garcia."

unit manager (Tr. 269:19-22), and at the time of the Accident, he was a unit manager.  (Tr. 269:23-270:18.)

8.   As of June 27, 2016, Otis Jones was a correctional counselor at MDC, and had been assigned to the K-82 unit for approximately four years.  (Tr. 295:24-296:24.)

**B. The K-82 Unit**

9.   The K-82 unit is located on the eighth floor of MDC.  (*E.g.*, Tr. 131:20-132:1.)  The unit has an open common area surrounded by two tiers of inmate cells, and the common area is 128 feet long and 34 feet in width from cell to cell. (Tr. 132:2-8, 189:22-190:19, 191:12-16.)  The two tiers of cells are connected by two internal staircases.  (Tr. 132:2-8, 191:12-16.)[8]

10.   The K-82 unit has showers on both levels.  (Tr. 132:9-10.)  The lower level showers are on the perimeter of, and open into, the common area.  (Tr. 221:22-222:6.)  They are located near one of the stairwells that connects the unit's two tiers; the distance from the front of the lower level showers to the side of the closest stairwell is seven feet, six inches. (Tr. 190:20-191:1.)  Additionally, there is an area within the

---

[8]    At trial, the court received into evidence as defendant's Exhibit D a drawn-to-scale diagram of the lower tier of the K-82 unit.  (Tr. 42:1-19.) Plaintiff testified that the diagram depicted the unit as it was configured on the date of the Accident.  (*Id.*)  Plaintiff marked on the diagram, among other things, the location of the ping pong table and the location where the Accident took place, but because the diagram was marked as "confidential" for security reasons, it is not reproduced in these Findings of Fact and Conclusions of Law.

showers in which inmates can dry themselves after they shower. (Tr. 235:1-20.)  Only one shower is open during the day, but at 4:00 p.m., all showers are open to accommodate inmates returning to the unit from court and education programs, among other things.  (*Id.*)  There are no bath mats outside the showers. (Tr. 234:5-16.)  Associate Warden Garcia testified that MDC does not use bath mats because bath mats are unsanitary and difficult to clean.  (*Id.*)

11.  A "slop sink" closet is located "immediately adjacent" to the lower level showers.  (Tr. 132:15-17.)  The slop sink is designed like a shower stall.  (Tr. 194:7-12.)  It is prefabricated and has a built-up wall that extends from the slop sink floor to about six inches above the floor.  (*Id.*) There is a drain in the middle of the slop sink basin, and a water faucet approximately three feet above the shallow basin. (Tr. 194:13-18.)  This three-foot clearance allows for filling a mop bucket with water.  (Tr. 194:19-21.)  The slop sink basin is approximately six inches deep and about 24 inches by 24 inches in width (Tr. 194:25-195:5), and the slop sink's drain pipe is located below the level of the bottom tier's concrete floor. (Tr. 196:22-197:4.)

12.  At the time of the Accident on August 29, 2013, the area in front of the showers and the slop sink was lit only by the lights inside the shower stalls, one wall light near the

shower stalls, and some lighting from the open common area.
(Tr. 47:24-48:13.) The staircase, however, partially blocked
the lighting from the common area. (*Id.*) Thus, the area in
front of the showers and slop sink was poorly lit.

13. The K-82 unit also had a ping pong table at the
time of the Accident. At that time, the ping pong table was
located at the same end of the open common area as the showers,
approximately three feet away from the stairway nearest the
showers and 18 to 20 feet away from the showers and slop sink.
(Tr. 36:17-20, 43:3-44:17, 46:1-4.)

14. For inmate safety and facility security reasons,
both the showers and the ping pong table must be situated to
allow MDC officers to observe them, and inmates using them,
easily. (Tr. 221:22-222:11 (showers), 232:9-233:20 (ping pong
table).) These same safety and security concerns require that
MDC officers remain vigilant with respect to the showers. (Tr.
221:22.) These safety and security concerns, however, did not
compel the placement of the K-82 unit's ping pong table in the
area where it was located at the time of the Accident, as other
units had ping pong tables located in different areas. (Tr.
240:16-241:7.)

15. Additionally, the floors of the open common area
are cement, and at the time of the Accident were painted. (Tr.

36:9-16, 139:115-20.)  The painted floors became slippery when wet.  (Tr. 36:9-16, 139:19-20.)

    16.  Officer Garcia was frequently assigned to unit K-82 in August 2013.  He observed that water would be tracked by inmates from the showers to the floors outside the showers about half the time he made rounds in the unit.  He was trained as a correctional officer to report dangerous conditions in the unit, but he did not report water that was tracked from the showers, and would have noted any report in the unit log book.  (Tr. 131-141.)

## II.  The Accident

### A. The Slip and Fall

    17.  Prior to the time of the Accident, plaintiff played ping pong approximately twice per week as a cardiovascular exercise.  (Tr. 44:22-45:7.)  At approximately 8:00 p.m. on August 29, 2013, plaintiff was playing ping pong in the common area of the lower tier of K-82 with a fellow inmate, who plaintiff identified as "D."  (Tr. 45:8-19.)[9]  Plaintiff and "D" had only one ping pong ball, and if that ball was lost or damaged, they would not be able to play any further.  (Tr. 45:20-25.)  At some point during their game, the ball left the table area, went under the nearest staircase, and ultimately

---

[9]     "D" did not testify at trial, nor is his account of events otherwise in evidence.

landed near the poorly-lit area outside the lower level showers and slop sink closet. (Tr. 46:20-47:10.)

18. Plaintiff walked to retrieve the ball, and as he rounded the staircase, he slipped. (Tr. 49:7-14.) Plaintiff landed on his knee, and his head fell back. (*Id.*) Plaintiff testified that after falling, the top half of his body was in a puddle that was at least three feet in diameter and his head was underneath the stairwell. (Tr. 49:7-50:9.) According to plaintiff, the puddle was deep enough that somebody brought him a pillow to keep his head out of the water. (Tr. 49:15-19.) Plaintiff testified that the water from this puddle caused his fall. (Tr. 50:16-51:2.)

19. Mr. Stewart was the head orderly in the K-82 unit at the time of the Accident. (Tr. 91:25-92:6.) As the head orderly, Mr. Stewart was called to the scene of the Accident and was responsible for cleaning the area, but did not witness the Accident itself. (Tr. 91:2-4, 91:25-29:6.) Mr. Stewart testified that he saw water on the ground in the area where the Accident occurred. (Tr. 91:8-22.)

20. Additionally, Officer Garcia was on duty in the K-82 unit at the time of the Accident (Tr. 142:2-4, 146:9-11), and noted the Accident on a "Daily Log" form. (Def. Ex. B.) According to Officer Garcia's entry, at 8:50 p.m. on August 29, 2013, "Inmate Gioeli . . . slipped on water by the lower tier

showers, a medical emergency was called, and the LTs (sic) on duty responded. [Plaintiff] was taken out of unit." (Tr. 146-148.) Officer Garcia also testified that, at the time of the Accident, no warning signs indicating that the floor was wet had been placed in the area of the Accident. (Tr. 157:17-159:14.)

21. Based on the foregoing testimony, the court finds that plaintiff has established by a preponderance of the evidence that on August 29, 2013, at approximately 8:50 p.m., he slipped and fell as a result of a wet condition originating from the showers, which created a slip hazard, outside the shower and slop sink closet area of the first tier of cells in the K-82 unit at MDC. The showers were busy at 8:50 p.m. because inmates had to shower before 9:30 p.m. when they were required to be in their cells for the night. (Tr. 176.)

22. The court also finds that at the time of the Accident, the defendant was aware that water was tracked from the showers to the area outside the shower, but did not place warning signs regarding the wet condition and slip hazard in the area outside the slop sink closet and the showers.

23. The plaintiff's fall on August 29, 2013, was caused by his slipping on water from the showers, in the same area that Officer Garcia frequently had observed that water was tracked by inmates from the showers.

**B. The Source and Recurrence of the Wet Condition**

   *1.   Plaintiff's Testimony*

Plaintiff testified that he had previously seen water in the same area as the water that caused the Accident, and that he had complained to Mr. Stewart and to MDC officials about water in that area prior to the Accident.  (Tr. 51:1-14, 37:12-38:4.)[10]  Plaintiff added that he first noticed the water condition after moving cells, because the water formed an obstacle in the most direct route between his new cell and the showers, and he "had to go around it."  (Tr. 37:12-20.)  According to plaintiff, water was not present in the area of the Accident every day, but was present "quite often."  (Tr. 53:1-25.)

Additionally, plaintiff testified that the water he slipped on was "a leak[,] . . . not shower water," because he could "see it coming under the wall."  (Tr. 52:8-20.)  Plaintiff also stated that the water was not from the showers because "from the showers . . . you get a little moisture on your feet," but "[t]his was a deep puddle."  Plaintiff explained his belief that water leaked from the slop sink because he observed water coming under the wall from the slop sink into the handicap cell where he was placed after the Accident.  (Tr. 54:1-20.)  The

---

[10]    In the cited excerpts, plaintiff refers to Mr. Stewart as "Fubu," which the record reflects is Mr. Stewart's nickname.

court does not credit plaintiff's testimony that the source of the water was a leak from "under the wall" given the evidence that the walls are made of cinderblock (Tr. 199), the floor is concrete, and water could not travel under the wall. (Tr. 208.)

### 2. *Mr. Stewart's Testimony*

At trial, Mr. Stewart testified that the water that caused the Accident came from the slop sink. (Tr. 91:11-15.) According to Mr. Stewart, at the time of the Accident and for approximately four months prior, the slop sink had been leaking. (Tr. 93:6-18.) As to the extent of the condition, he testified that "a lot of times," water would come from the slop sink and the wet condition would extend past the stairwell nearest the slop sink. (Tr. 91:16-19.)[11]

Regarding the nature of the slop sink leak, Mr. Stewart testified that the slop sink basin was cracked, that there was no hose attached to the slop sink faucet, and that consequently, water would splash out rather than go straight down when the slop sink was used and would leak out of the basin. (Tr. 95:14-20, 96:22-97:22.) According to Mr. Stewart, these conditions existed at the time of the Accident. (*Id.*)

---

[11] Mr. Stewart also referred to a water fountain and ice machine in the area of the slop sink closet. (Tr. 93:11-16, 98:2-10.) Mr. Stewart's testimony suggests that he referred to the water fountain and ice machine only to describe the location of the wet condition, rather than to suggest that the water fountain and/or ice machine contributed to the wet condition. (*See id.*)

Mr. Stewart further testified that he reported the water condition in the area outside the slop sink closet and the cracked slop sink basin to at least two MDC officials "[b]etween five and ten [times,] at least." (Tr. 94:5-95:21.)[12] Additionally, Mr. Stewart specifically and expressly testified that he reported the lack of a hose and consequent water splashing to MDC officials prior to the Accident. (Tr. 96:22-97:22.) He also testified that he saw maintenance personnel come to the unit and inspect the slop sink, but that no repairs were ever made prior to the Accident. (Tr. 96:1-26.)

According to Stewart, mopping twice per day in the area of the Accident was "mandatory," but in the areas where water collected, he and the other orderlies regularly mopped four to five times per day. (Tr. 98:2-21.) Further, when the court asked Mr. Stewart what he saw regularly in the area where the Accident occurred prior to the Accident, Mr. Stewart responded that he saw water "all the time," and the water was "out in the open." (Tr. 99:16-25.)

---

[12]    At trial, Mr. Stewart testified that he reported the condition to a Mr. Jones and a Mr. Wilkins. (Tr. 94:5-95:12.) Defense counsel confronted Mr. Stewart with deposition testimony in which Mr. Stewart claimed to have reported the condition to a Mr. Jones and a Mr. Taylor, and Mr. Stewart responded that he had reported the condition to Mr. Taylor as well. (Tr. 108:6-109:19.) Regardless of the specific individuals to whom Mr. Stewart asserts he reported the wet condition, he has consistently testified that he reported it to at least two MDC officials.

### *3.   Officer Garcia's Testimony*

Officer Garcia's testimony also addressed the existence of a recurring wet condition in the area of the Accident.  According to Officer Garcia, water would collect on the floor of the K-82 unit in the area outside the showers as a result of inmates tracking water from the showers.  (Tr. 134:6-11.)  Officer Garcia further testified that, at around the time of the Accident, he observed this wet condition approximately half the time that he was in the K-82 unit, and on half of his three to five daily rounds through the unit.  (Tr. 134:12-135:7.)

According to Officer Garcia, this water was generally in front of the showers, rather than in front of the adjacent slop sink closet.  (Tr. 140:18-24.)  Officer Garcia acknowledged, however, that he saw water in the area in front of the slop sink closet "when inmates were going to clean," because they would "fill up the mop bucket" in the slop sink closet. (*Id.*)  Officer Garcia also acknowledged that inmates could track water in the area of the slop sink closet upon exiting the shower area, although he noted that at the time of the Accident, inmates would generally walk in the opposite direction upon leaving the showers, to avoid the line of inmates waiting to shower.  (Tr. 143:21-145:9.)

14

Officer Garcia testified that based on his training, he would have verbally reported a wet condition on the floor of the K-82 unit to his supervisor. (Tr. 135:8-11, 137:15-25.) Officer Garcia, however, distinguished between a wet condition of the type he would have reported and water "from the showers." (Tr. 135:8-14, 138:12-17.) Officer Garcia further testified that had he made a verbal report of a wet condition to a supervisor, he would have noted it in a log book (Tr. 141:13-18), but no log book entry with such a notation is in evidence.

Additionally, Officer Garcia testified that in the position he held at the time of the Accident, he had the authority to direct orderlies to mop or otherwise clean a wet floor, and that he "at times" did order such mopping and cleaning. (Tr. 140:25-141:12.) Officer Garcia did not recall whether he had given any such direction on the date of the Accident, and stated that he would not record giving any such direction in any log book. (*Id.*) Officer Garcia further testified that orderlies typically would wait until shower hours ended to mop the area outside the showers, although he did not clearly state whether the orderlies had waited to mop on the evening of the Accident. (Tr. 155:2-22.)

Officer Garcia also recalled that the water on the ground at the time of the Accident was "not like a full puddle or pool," but was instead consistent with water being tracked

out of the showers. (Tr. 174:10-25.) Additionally, Officer Garcia testified that he did not see any water coming from the slop sink closet at the time (Tr. 175:1-3), and that the showers were busy at the time of the Accident because of inmates seeking to shower before being secured in their cells for the night. (Tr. 176:14-21.)

### 4. *Warden Garcia's Testimony*

At trial, the court asked Warden Garcia about practices relating to mopping in the area outside the showers. Warden Garcia indicated that only one shower is open during the day, until 4:00 p.m., because of water being tracked or splashed from the showers. (Tr. 235:1-20.) Warden Garcia further testified that orderlies are available and can be told "to mop in front of the showers to prevent the water that comes out of the showers." (*Id.*) He added that because inmates can dry themselves in a "sally port" area before exiting the showers, there is "minimal water" in the area outside the showers. (*Id.*) Warden Garcia, however, did not work at MDC until three years after the Accident. (Tr. 237:16-238:6.) Therefore, Warden Garcia lacks personal knowledge of conditions in MDC's K-82 unit at the time of the Accident.

### 5. *Mr. Taylor's Testimony*

Mr. Taylor testified that at the time of the Accident, he was a case manager assigned to the K-82 unit, as well as to

16

two other units, and that he visited the K-82 unit on a daily basis. (Tr. 246:3-24.) According to Mr. Taylor, he typically checked the showers, as well as the slop sink closet, when he entered the unit. (Tr. 247:5-248:1.) Mr. Taylor was asked if he recalled seeing water on the floor next to the shower stalls when he entered the unit, and he responded:

> I wouldn't use the word water, sometimes it's wet, but there's always – that yellow safety sign, and there'll always be . . . [an] inmate orderly assigned to that area to make sure they check it, to mop it on a regular basis.

(Tr. 248:9-14.)

Mr. Taylor clarified that the safety sign he referred to was a "big yellow caution sign" written in both English and Spanish, and that he would typically see the sign "right in the area where the bathroom, the slop sink is . . . [n]ear the shower area." (Tr. 248:15-249:3.) Further, Mr. Taylor testified that he saw the sign "[p]retty much daily," and that if he entered the unit and did not see it, he would "ask the head orderly or the unit officer to make sure, or the counselor." (Tr. 249:4-8.) It is not clear, however, whether Mr. Taylor meant that he would ask others to put the sign out, to confirm that the sign was not necessary, or something else entirely.

Mr. Taylor further testified that at around the time of the Accident, he was never made aware of a leak in the slop

sink closet. (Tr. 251:4-6.) Additionally, according to Mr. Taylor, he was never made aware of any repairs to the slop sink closet after the Accident. (Tr. 251:7-9.)

### 6. Mr. Maffeo's Testimony

Mr. Maffeo's testimony addressed the process by which MDC documents repairs made at the facility, and the contents of MDC's records. According to Mr. Maffeo, the Bureau of Prisons maintains a nationwide system of records known as the Total Maintenance System ("TMS"), in which each institution has its own database. (Tr. 193:5-17.) TMS tracks "all the work orders" for repairs, including plumbing repairs, generated for a particular facility, and was operational at MDC in 2013. (Tr. 193:5-18.) Mr. Maffeo testified that he searched TMS for the period of six months before and after the date of the Accident on August 29, 2013, and found no record of any work orders or repairs relating to the slop sink in the K-82 unit, or of "any work orders that may relate to any water condition." (Tr. 193:20-194:2.)

Mr. Maffeo further testified that if the slop sink basin were cracked, the entire basin would need to be replaced. (Tr. 195:6-9.) Further, according to Mr. Maffeo, MDC does not keep spare basins in inventory, and therefore, a new basin would need to be ordered from an outside vendor. (Tr. 195:10-16.) Mr. Maffeo testified that the order would be recorded on TMS,

18

but his search of TMS for the period of six months before and after August 29, 2013 did not indicate that a replacement slop sink basin had been ordered. (Tr. 195:17-22.) Additionally, Mr. Maffeo testified that he never observed any cracks in the K-82 unit's slop sink basin, nor any defects in the K-82 unit's slop sink drain in the timeframe before August 2013. (Tr. 196:3-8.)

Mr. Maffeo also testified that water "possibly can" splash out of the slop sink onto the floor outside the basin when the faucet is used (Tr. 197:5-8), but slop sink faucets usually have "a plastic hose" attached, which "would keep the water in the basin." (Tr. 197:9-13.) Mr. Maffeo, however, stated that he did not know whether the K-82 unit's slop sink had such a hose on the date of the Accident, and that "simple parts" like slop sink hoses are usually kept in MDC inventory. (Tr. 197:14-22.) Further, Mr. Maffeo testified that he did not personally inspect the K-82 slop sink at around the time of the Accident, and that he did not recall answering any maintenance or repair calls related to plumbing in the K-82 unit in August 2013. (Tr. 197:23-198:19.)

### 7. *Findings*

Defendant argues that the court should not credit plaintiff's or Mr. Stewart's trial testimony on the basis of their prior criminal convictions (Def. Mem. ¶¶ 132, 134), and

that plaintiff and Mr. Stewart's testimony is not credible because certain other witnesses' testimony conflicts with it. For instance, defendant notes that Mr. Taylor testified that Mr. Stewart prepared food for plaintiff and cleaned for him, which defendant contends contradicts portions of plaintiff and Mr. Stewart's testimony. (*Id.; see also* Tr. 262:10-265:17 (Mr. Taylor's testimony).) Defendant also notes that Mr. Maffeo testified that water cannot leak under the wall between the slop sink closet and an adjacent handicap-accessible cell in which plaintiff was at one point lodged, which contradicts plaintiff's testimony that water did leak under that wall. (Def. Mem. ¶¶ 133, 138 (citations omitted).)

The substance of the foregoing conflicts, however, relates to issues that are immaterial to the existence of a recurring wet condition in the area of the slop sink closet and showers, and to defendant's knowledge of that condition. Moreover, defendant's own witnesses testified that the area where the Accident occurred is frequently wet. To reiterate, Officer Garcia testified that water would collect on the floor of the K-82 unit in the area outside the showers as a result of inmates tracking water out following their showers and that, at around the time of the Accident, he observed this wet condition on approximately half of his three to five daily rounds through the unit. (Tr. 134:6-135:7.) Further, although Mr. Taylor

testified that he "wouldn't use the word water" in describing the condition in which he regularly found the area outside the showers, he conceded that the area was "sometimes . . . wet," that when such condition was noticeable it prompted the use of a "yellow safety sign," and that an orderly was assigned to mop the area on a regular basis.  (Tr. 248:9-14.)

Additionally, none of defendant's witnesses contradicted Mr. Stewart's testimony that the K-82 slop sink lacked a hose attached to the spigot at the time of the Accident.  Instead, the only witness to address the issue, Mr. Maffeo, testified that he did not know whether the K-82 slop sink had a hose at the time of the Accident to prevent water from splashing onto the floor.  (Tr. 197:14-22.)  Further, Mr. Maffeo's testimony supports the conclusion that, although a slop sink hose will keep water in the slop sink basin when the faucet is turned on, the absence of a hose is likely to splash out whenever the spigot is turned on.  (*See* Tr. 197:5-13.)

Mr. Maffeo's testimony is particularly significant due to Officer Garcia's testimony that he saw water in the area outside the slop sink closet "when inmates were going to clean," because they would "fill up the mop bucket" in the slop sink closet.  (Tr. 140:18-24.)  In light of Mr. Maffeo's testimony about the splashing of water from the slop sink spigot in the absence of a hose, Officer Garcia's testimony supports Mr.

Stewart's contention that the slop sink in the K-82 unit lacked a hose and that water was a recurring presence in the area. Consequently, the court credits Mr. Stewart's testimony that the slop sink lacked a hose at the time of the Accident, and that due to the lack of a hose, water splashed outside of the K-82 unit's slop sink whenever the faucet was turned on.[13]

Based on the foregoing testimony regarding inmates tracking water out of the showers and the splashed water conditions from the slop sink, the court concludes that a recurring wet condition existed in the area in the K-82 unit directly outside the showers and the slop sink closet. The court need not resolve the conflicting testimony between Mr. Stewart and defendant's witnesses as to whether the slop sink in the K-82 unit was cracked. Instead, the testimony establishing that inmates regularly tracked water out of the shower area, that the showers were heavily used after 4:00 p.m. and particularly as the time approached 9:30 p.m., and that water would splash out of the slop sink whenever the slop sink faucet

---

[13]     Although defendant asserts that the court should reject the "missing hose theory" because it was not advanced in discovery, defendant did not object to or otherwise raise the hose issue at trial.  Further, Mr. Stewart was the second witness to testify.  Thus, defendant had ample opportunity to question its witnesses regarding the existence of a hose in the slop sink, as all of defendant's witnesses testified after Mr. Stewart.  Additionally, the government elicited testimony from certain of its witnesses that they had personal knowledge of the condition of the slop sink in the K-82 unit at the time of the Accident.  Consequently, defendant cannot complain that it lacked the opportunity to locate and produce a witness who had personal knowledge sufficient to rebut Mr. Stewart's testimony.

was turned on, suffices for the court to find by a preponderance of the evidence that the area where the Accident occurred was regularly wet, and that the wet condition was apparent.

Additionally, the court finds that the general practice in the K-82 unit was to allow water to accumulate in the area outside the showers during evening shower hours, and to mop the area only after shower hours ended. Further, all witnesses who testified on the topic agreed that the floor of the K-82 unit became slippery when wet because of the paint used on the floor. Thus, the court finds that the recurring wet condition in the area outside the showers and the slop sink closet in the K-28 unit created a slip hazard concurrent with, and in the same area as, the wet condition.

The court finds that defendant had notice of the recurring wet condition and slip hazard. (*See* Def. Mem. at 25, 28-30.) Even setting aside the testimony from plaintiff and Mr. Stewart, ample evidence supports the conclusion that defendant had notice of these conditions. Significantly, Mr. Taylor testified that, on a "[p]retty much daily" basis, he saw a "yellow safety sign . . . right in the area where the bathroom, the slop sink is . . . [n]ear the shower area," as well as the assignment of an orderly to mop the area on a regular basis. (Tr. 248:9-249:8.) Defendant does not explain why a yellow safety sign would be present in the area outside the showers and

slop sink closet on a near-daily basis, or why an orderly would be stationed to mop the area, other than in response to a known wet condition and slip hazard.  Thus, the court finds that defendant had actual notice of the recurring wet condition in the area outside the showers and slop sink closet in the K-82 unit, where the Accident occurred.

**CONCLUSIONS OF LAW**

## I.  The Discretionary Function Exception

"Federal courts do not have subject matter jurisdiction over claims falling within one of the exceptions to the FTCA's waiver of sovereign immunity."  *Haber v. United States*, No. 10-CV-5443(SJF)(ARL), 2012 WL 92499, at *4 (E.D.N.Y. Jan. 10, 2012).  One such exception, commonly referred to as the discretionary function exception, excludes from the FTCA any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of . . . an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  The discretionary function exception applies "only if two conditions are met: (1) the acts alleged to be [tortious] must be discretionary, in that they involve an 'element of judgment or choice' and are not compelled by statute or regulation and (2) the judgment or choice in question must be grounded in 'considerations of public policy' or susceptible to policy

analysis." *Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000) (citing *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991) and *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988)); *accord Reichhart v. United States*, 408 F. App'x 441, 443 (2d Cir. 2011) (citations omitted).

Plaintiff asserts that defendant is liable to him for his injuries based on its decisions in locating the ping pong table in a particular place and failing to remedy properly a recurring wet condition and slip hazard in unit K-82. Warden Garcia testified in general terms that there is a risk that facility inmates could use ping pong paddles as weapons. (Tr. 230:21-231:6.) He also identified this risk as a reason to put the ping pong table in view of a "counseling room" in which a correction officer is stationed. (Tr. 232:23-231:1.) Warden Garcia, however, never testified that the precise location of the ping pong table in unit K-82 was selected based on policy considerations.

Moreover, Warden Garcia also testified that other units at MDC also have ping pong tables, and that certain other units' ping pong tables are situated in different locations relative to their units' showers when compared with the ping pong table in K-82. (Tr. 240:16-241:7.) The potential policy issues defendant identifies as involved in determining where to situate a ping pong table would not be implicated in selecting

one of a number of potential locations in corrections officers'
line of sight, as all potential locations would satisfy the
relevant policy objectives.

Similarly, there is no indication that defendant's
actions in failing to remedy properly the wet condition and slip
hazard are grounded in public policy considerations or
susceptible to policy analysis.  The Second Circuit's summary
order in *Reichhart v. United States*, 408 F. App'x 441 (2d Cir.
2011), provides a useful example of a government decision not to
remedy a hazard that falls within the discretionary function
exception.

In *Reichhart*, a plaintiff slipped and fell on a
federally-owned pier.  408 F. App'x at 442.  The Second Circuit
noted that the Army Corps of Engineers, which maintained the
pier, was "aware of the condition of the [p]ier at the time of
the accident."  *Id.* at 443.  The Army Corps of Engineers,
however, decided not to make repairs to the pier after
considering "among other things, the purpose of the [p]ier,
whether the deterioration of the [p]ier's surface compromised
its structural integrity, whether the hazard was open and
obvious, the cost to repair the [p]ier, and allocation of the
Corps' resources."  *Id.*  Based on the Corps' rationale for
declining to repair the pier, the Second Circuit affirmed the

district court's judgment that the plaintiff's claim was foreclosed by the discretionary function exception.

Here, by contrast, there is no indication that, in determining whether and how to address the recurring wet condition and slip hazard in the area outside the unit K-82 showers and slop sink closet, MDC officials engaged in any policy analysis whatsoever, much less a robust analysis comparable to the Army Corps of Engineers' analysis in *Reichhart*. Consequently, the court concludes that the judgment actually exercised by MDC officials in selecting a location for the ping pong table, and whether and how to go about remedying the wet condition and slip hazard, was not "the kind of considered judgment grounded in social, economic, and political policy which the [discretionary function exception] is intended to shield from judicial second-guessing." *Coulthurst*, 214 F.3d at 111 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)) (internal quotation marks omitted). Accordingly, the discretionary function exception does not bar the court from adjudicating plaintiff's claim.

## II. The United States' Liability

### A. Applicable Law

#### 1. The FTCA

Under the FTCA, the United States is liable in the same manner as a private person for the tortious acts or

omissions of its employees acting within the scope of their employment "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1); *see also Molzof v. United States*, 502 U.S. 301, 305 (1992) ("[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law.") (citations omitted). Accordingly, a federal court presiding over an FTCA claim must apply "the whole law of the State where the act or omission occurred." *Richards v. United States*, 369 U.S. 1, 11 (1962); *see also Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) ("State law applies to an FTCA claim."). Further, state law applies to the alleged acts and omissions of the United States in an FTCA claim in the same manner it would apply to a private person. The United States may not be held to a stricter standard of care than would apply to a private defendant under similar circumstances, *see* 28 U.S.C. § 1346(b)(1), nor be subject to strict liability. *See Laird v. Nelms*, 406 U.S. 797, 803 (1972). Plaintiff's alleged injury occurred within the State of New York. Accordingly, New York law applies.

### 2. *New York Tort Law*

To prevail on a negligence claim under New York law, plaintiff must establish by a preponderance of the evidence: "(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom."

*Solomon v. City of New York*, 489 N.E.2d 1294, 1294-95 (N.Y. 1985) (citations omitted); *see also Khalil-Mirhom v. Kmart Corp.*, No. 12-CV-5512 (ARR)(VVP), 2014 WL 173415, at *4 (E.D.N.Y. Jan. 13, 2014); *Berger v. Becker*, 709 N.Y.S.2d 418, 418 (N.Y. App. Div. 2000). "Negligence is conduct that falls beneath the standard of care which would be exercised by a reasonably prudent person in similar circumstances at the time of the conduct at issue." *Thaqi v. Wal-Mart Stores East, LP*, No. 09-CV-755 (JMA), 2014 WL 1330925, at *4 (E.D.N.Y. Mar. 31, 2014) (quoting *Harper v. United States*, 949 F. Supp. 130, 132 (E.D.N.Y. 1996)). To establish a fact by a preponderance of the evidence, a plaintiff must "prove that the fact is more likely true than not true." *See Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) (internal quotation mark and citation omitted) (quoting 4 Leonard Sand *et al.*, *Modern Federal Jury Instructions* ¶ 73.01 (1997)).

Here, the proper private law analog to defendant is a landlord, property owner, or tenant in possession of real property with common areas. Under New York law, "[a]n owner or tenant in possession of realty owes a duty of reasonable care to maintain the property in a safe condition." *McGill v. Caldors, Inc.*, 522 N.Y.S.2d 976, 977 (N.Y. App. Div. 1987) (collecting cases); *accord Wynn ex rel. Wynn v. T.R.I.P. Redevelopment Assocs.*, 745 N.Y.S.2d 97, 100 (N.Y. App. Div. 2002) ("Under

long-standing common law, a landlord has a duty to use ordinary care to keep those areas which are reserved and intended for the common use of the tenants and owner of the building and subject to the landlord's control, *i.e.*, the common areas, in a reasonably safe and suitable condition."  (internal quotation marks omitted) (collecting cases)).

Further, under New York law, "[a] landowner's liability for a slip and fall is premised upon proof that the landowner knew, or in the exercise of reasonable care, should have known that a dangerous condition existed but, nevertheless, failed to remedy the situation within a reasonable time period." *McCombs v. Related Mgmt. Co. L.P.*, 736 N.Y.S.2d 166, 167 (N.Y. App. Div. 2002) (citing *Orr v. Spring*, 732 N.Y.S.2d 697, 699 (N.Y. App. Div. 2001)).  "[C]onstructive notice may be attributed to a defendant who had actual notice of a recurring problem in the location the accident occurred."  *Tuthill v. United States*, 270 F. Supp. 2d 395, 400 (S.D.N.Y. 2003) (citing *Hirschman v. City of New York*, 597 N.Y.S.2d 154, 154-55 (N.Y. App. Div. 1993)); *see also Brown v. Linden Plaza Hous. Co.*, 829 N.Y.S.2d 571, 571-72 (N.Y. App. Div. 2007) ("A defendant who has actual knowledge of an ongoing and recurring dangerous condition can be charged with constructive notice of each specific reoccurrence of the condition." (citations omitted)); *Weisenthal v. Pickman*, 545 N.Y.S.2d 369, 371 (N.Y. App. Div. 1989) ("When a

landowner has actual knowledge of the tendency of a particular

dangerous condition to reoccur, he is charged with constructive

notice of each specific reoccurrence of that condition."

(citations omitted)).[14]

Additionally, "the plaintiff must show that the

defendant had such knowledge of the particular dangerous

condition that is qualitatively different from a mere general

awareness that a dangerous condition may be present." *Gonzalez*

*v. Wal-Mart Stores, Inc.*, 299 F. Supp. 2d 188, 193 (S.D.N.Y.

2004) (quoting *Chin v. Harp Marketing*, 648 N.Y.S.2d 697, 698

(N.Y. App. Div. 1996)) (internal quotation marks omitted).

Based on the facts adduced at trial, the court

concludes that plaintiff has established that the United States

breached its duty of care and that his injuries proximately

resulted from this breach.  Thus, the United States is liable

---

[14]     Defendant contends that New York law also requires that a landlord "routinely le[ave] unaddressed" a recurring hazardous condition before he can be charged with constructive notice.  (Def. Mem. at 29 (citation omitted).) The court respectfully disagrees.  The authority to which defendant cites, *O'Connor-Miele v. Barhite & Holzinger, Inc.*, 650 N.Y.S.2d 717 (N.Y. App. Div. 1996), states that a plaintiff "may" establish a landlord's constructive notice of a hazard "by evidence that an ongoing and recurring dangerous condition existed in the area of the accident which was routinely left unaddressed by the landlord."  650 N.Y.S.2d at 719 (citations omitted).  As discussed herein, however, numerous decisions from New York courts, and federal courts applying New York law, articulate a different showing by which a plaintiff may establish constructive knowledge.  Consequently, the court concludes that the showing described in *O'Connor-Miele* does not represent the exclusive method for establishing constructive knowledge.  In any event, Officer Garcia's testimony establishes that the typical practice at MDC is to allow water to accumulate in the area of the Accident during periods of heavy shower use in the evenings, and then mop the water only after shower hours ended.  (Tr. 155:2-22.)  Based on this testimony, plaintiff has shown by a preponderance of the evidence that defendant routinely left unaddressed the recurring wet condition and slip hazard in the area of the Accident.

for plaintiff's injuries.  Plaintiff, however, was also negligent, and for the reasons set forth below, the court apportions liability between the parties at 50% each.

**B. Primary Assumption of Risk**

Defendant asserts that it is not liable to plaintiff under the doctrine of primary assumption of the risk.  The court respectfully rejects defendant's assertion.  "Pursuant to the doctrine of primary assumption of risk, a voluntary participant in a sporting or recreational activity consents to those commonly appreciated risks which are inherent in and arise out of the nature of the sport generally and flow from such participation."  *Weinberger v. Solomon Schechter Sch. of Westchester*, 961 N.Y.S.2d 178, 181 (N.Y. App. Div. 2013) (internal quotation marks and citations omitted).  Importantly, "in assessing whether a defendant has violated a duty of care within the genre of tort-sports activities and their inherent risks, the applicable standard should include whether the conditions caused by the defendants' negligence are unique and created a dangerous condition over and above the usual dangers that are inherent in the sport."  *Id.* (quoting *Morgan v. State*, 685 N.E.2d 202, 208 (N.Y. 1997)) (internal quotation marks omitted).

As the New York Court of Appeals has explained, "assumption of risk is not an absolute defense but a measure of

the defendant's duty of care." *Morgan*, 685 N.E.2d at 207

(quoting *Turcotte v. Fell*, 502 N.E.2d 964, 968 (N.Y. 1986)). In

the context of sporting activities, a "[d]efendant's duty . . .

is a duty to exercise care to make the conditions as safe as

they appear to be. Thus, . . . a premises owner continues to

owe a duty to exercise care to make the conditions as safe as

they appear to be. If the risks of the activity are fully

comprehended or perfectly obvious, plaintiff has consented to

them and defendant has performed its duty." *Id.* (quoting

*Turcotte*, 502 N.E.2d at 968) (internal quotation marks omitted).

Further, "participants will not be deemed to have assumed the

risks of reckless or intentional conduct[,] or concealed or

unreasonably increased risks." *Id.* at 208 (citations omitted).

Here, the court concludes that playing on a wet

surface is not an inherent feature of playing ping pong, and

that a wet condition near the playing surface presents a slip

hazard that unreasonably increases the risk of ping pong.

Moreover, the area of the Accident was on the other side of the

stairwell relative to the ping pong table, and the area was

poorly lit. These facts establish that the risk was not open

and obvious to the plaintiff as he played ping pong. These

factors distinguish the instant action from the authorities to

which defendant cites for the proposition that "plaintiffs are

barred from recovery with respect to obvious risks involving

less than optimal playing conditions." (Def. Mem. at 22 n.1 (citations omitted).) A review of defendant's cited authorities makes clear that all involved readily-observable defects and conditions directly on, or immediately proximate to, playing areas, rather than hazards in a nearby area that was poorly lit and, in any event, difficult to see from the playing area. (*See id.*)

Consequently, the court concludes that the primary assumption of risk doctrine does not bar plaintiff's recovery in this case. The court notes, however, that even where a plaintiff has not assumed the risk so as to bar recovery under the primary assumption of risk doctrine, the nature of the negligent condition may nonetheless "implicate typical comparative negligence principles," which in turn may reduce plaintiff's recovery. *Morgan*, 685 N.E.2d at 210; *see also*, *e.g.*, *Stirpe v. T.J. Maloney & Sons Inc.*, 675 N.Y.S.2d 709, 710 (N.Y. App. Div. 1998) ("Since the [primary assumption of risk] doctrine is clearly not applicable here, the comparative negligence statute applies [and] reduces the plaintiff's recovery in the proportion which his or her conduct bears to the defendant's culpable conduct." (internal quotation marks and citations omitted).)

## C. Defendant's Negligence

The court has already concluded that defendant had actual knowledge of a recurring wet condition and slip hazard in the area of the Accident. Thus, as a matter of law, defendant "can be charged with constructive notice of each specific reoccurrence of the condition." *Brown*, 829 N.Y.S.2d at 571-72 (citations omitted); *see also Tuthill*, 270 F. Supp. 2d at 400 ("[C]onstructive notice may be attributed to a defendant who had actual notice of a recurring problem in the location the accident occurred." (citing *Hirschman*, 597 N.Y.S.2d at 154-55)). The court has also concluded that the wet condition and slip hazard caused the Accident, which resulted in injuries to plaintiff.

The court further concludes that defendant "failed to remedy the situation within a reasonable time period." *McCombs*, 736 N.Y.S.2d at 167. The evidence presented at trial establishes that MDC officials continuously observe the shower area due to safety and security concerns, and that the showers were in particularly heavy use at the time of the Accident, which would necessitate greater vigilance from MDC officials to ensure that the wet conditions were addressed promptly. The evidence presented at trial also establishes that MDC officials have the power to direct orderlies to clean the area where the Accident occurred, and that orderlies are on duty throughout

shower hours.  In light of the heightened vigilance in the area of the Accident and at the time of the Accident, and of MDC officials' ability to summarily direct on-duty orderlies to clean and/or mop, it would have been reasonable for MDC officials to set about remedying the wet condition and slip hazard immediately upon their recurrence at the time of the Accident.

There is no indication, however, that MDC officials made any effort to remedy the wet condition and slip hazard when they materialized on the evening of the Accident.  Instead, all evidence relevant to efforts to remedy the wet condition and slip hazard indicates that these efforts were not reasonable or adequate.  Officer Garcia's testimony establishes that no signs warning of a wet condition had been placed in the area at the time of the Accident.  Officer Garcia's testimony also establishes that the typical practice at MDC is to allow water to accumulate in that area during shower hours, and then mop the water only after shower hours have ended.  Consequently, the court concludes that defendant breached its duty to remedy in a reasonable time the recurring hazardous condition that caused plaintiff's injuries, and defendant is liable to plaintiff for its negligence.

## D. Plaintiff's Negligence

As noted above, under New York law, a plaintiff's recovery may be reduced in proportion to his culpability for the damages he suffered.  *See Stirpe*, 675 N.Y.S.2d at 710 (citations omitted).  At trial, plaintiff conceded that he was aware of the recurrent wet condition near the ping pong table in unit K-82. (Tr. 37:4-20.)  Plaintiff testified that the wet condition in the area of the Accident had "existed for quite a while," and that in the course of his daily routine in unit K-82, he "had to go around it."  (*Id.*)  Plaintiff also testified that he had previously informed Mr. Stewart and various MDC officers of the wet condition.  (Tr. 37:23-38:4.)

Based on plaintiff's testimony that he had prior knowledge of the recurring wet condition and how to avoid it, the court concludes that plaintiff was also negligent, and that his negligence and defendant's negligence contributed equally to causing the Accident.  Consequently, the court apportions liability at 50% each between plaintiff and defendant.  *See Rooney v. State*, 488 N.Y.S.2d 468, 471 (N.Y. App. Div. 1985) ("We agree with the trial court's finding that negligence on the part of the claimant . . . was a proximate cause of the accident. In view of claimant's testimony showing that she had prior knowledge of the recurring [hazardous] condition . . . , and her opportunity to avoid the problem on the day of the

accident, . . . we conclude that a more appropriate apportionment of liability between claimant and defendants would have been 50%.").

## CONCLUSION

For the foregoing reasons, the court concludes that the United States was negligent, that plaintiff was also negligent, and that the appropriate apportionment of liability between plaintiff and defendant is 50% each.  The parties shall appear for a status and scheduling conference on **January 17, 2019 at 1:00 p.m.**, in Courtroom 6C South, United States Courthouse, 225 Cadman Plaza East, Brooklyn, New York.

**SO ORDERED.**

```
            _____/s/_____
            KIYO A. MATSUMOTO
            United States District Judge
            Eastern District of New York
```

Dated: November 28, 2018
       Brooklyn, New York